Fecteau, Francis R., J.
This is an action brought by the plaintiff in which he seeks damages for an alleged breach of a contract for restoration services he agreed to provide the defendant. The contract was for the restoration of a park monument known as the Rogers-Kennedy Memorial, and is located in the western section of Elm Park, at the comer of Park Avenue and Highland Street in the City of Worcester. The parties do not dispute the existence of a valid contract; the controversy between them concerns the circumstances which led to the city terminating the contract and preventing the plaintiff from finishing the restoration work he began. The plaintiffs specific complaint is that he has substantially performed the contract, but that a substantial amount of services that he and his company provided pursuant to the contract has gone unpaid despite demand. The city contends that the plaintiff failed to substantially and adequately perform his responsibilities under the original contract as amended amounting to a material breach by the plaintiff that excuses the city from any further performance.
The trial of this matter was conducted before me, sitting without jury, on October 25-28, 2005; leave was granted for additional time for the parties to prepare and file proposed findings of fact and mlings of law. On November 15, 2005, the parties were heard in final argument and thereafter, the matter was taken under advisement. Findings of fact and rulings of law follow.

FINDINGS OF FACT

1. The plaintiff, Emmanuel Tsitsilianos, born in Athens, Greece, and now a resident of Worcester, has since his childhood been involved in the restoration of works of art of various kinds, including buildings and monuments. Since approximately 1964, when he came to this country, locating in the Atlanta, Georgia area, he has operated International Restoration Specialists, a sole proprietorship. Shortly after his marriage, he relocated to Worcester in 1983, residing in an apartment located off Park Avenue. Thereafter, he often traveled by a nearby monument on Park Avenue known as the Rogers-Kennedy Memorial (“the monument”), named after its donor, and intended to honor the pioneer spirit of America, upon which the country was built, by its representations of nameless persons engaged in labor of various kind. Seeing its state of deterioration, and in particular the absence of pointing and mortar between the blocks of stone that make up the base of the monument, as well as the state of deterioration to the stone, and being aware of the destruction that water seeping inside the stonework can cause especially when it freezes and expands, he developed a professional interest in the improvement of its condition and saw it as a way to express, personally and visually, his appreciation as an immigrant for being welcomed and allowed to relocate in this country.
2. The monument is owned by the defendant City of Worcester (“city”). It is located on park land, in the western section of Elm Park which lies across Park Avenue from the main section of the park. It is in a relatively low-lying, partially tree-covered area near the intersection of Park Avenue and Highland Street. It was commissioned in 1926, sculpted in Italy, and assembled in 1929, on the site.
3. The monument consists of two main sections and materials; a rectangular base consisting of 6 courses of Trani limestone, featuring 16 panels that are approximately 8 feet tall, of various widths and more than 2 feet thick that depict various laborers, in bas-relief, representative of many different trades and occupations, including farmers, fishermen, and factory workers, to name a few, and topped by a bronze statue of a man and a woman, quite larger than life-size, each holding one of the handles of a plow. There are two courses of limestone block below the panels and three courses above. The top two courses of stone above the panels are configured in shape of a triangle, which serves to accommodate a triangular base of the bronze statue.
4. The Trani limestone used is indigenous to the south of Italy. In spite of the original sculptor’s prediction of its hardiness, it is by all present accounts to be poorly suited for exposure to the extremes of New England weather. From soon after its construction, the monument was often noted to have suffered considerable deterioration by its exposure to these elements as *397 well as inadequate maintenance, especially of the seams; there had been several prior efforts made to preserve the monument and the stone panels, including the use of various coatings.
5.When the plaintiff first began to express interest in restoring the monument in 1986, the city had already obtained funding for restoration of the monument and had already begun a bidding process. The plaintiff made inquiry of officials of the parks department, the division of the city that had jurisdiction over and responsibility for the management and maintenance of the parks and its features, such as the monument. Apparently due to the city’s lack of satisfaction with the amounts bid during the first round, it was decided to reopen the bidding; the plaintiff, and others, were invited, over the course of October 31 to November 3, 1986, to submit a proposal. He was sent a set of the bid documents, which included a set of specifications and contract requirements, all expressly subject to various statutes, including G.L.c. 30, §§39A-M. He submitted his bid on the final day, November 19, 1986.
6.The request for bids called for the project to include the “removal, cleaning, treating for restoration and preservation and reinstallation of bronze figures and the dismantling, consolidating, cleaning, restoring, conserving, and re-erection of stone panels comprising the base.” (Ex. 6, ¶1.) The invitation to bid indicated that any bidder should become, and is expected to be knowledgeable of the project by making a careful examination of the plans and specifications, as well as making site visits prior to the submission of a bid. Moreover, the submission of a bid would be taken as a statement of understanding by the bidder of the nature of all of the work and materials required.
7.The total amount of the bid was to be allocated across 5 phases of work: dismantling, core repair, metal conservation, masonry conservation and reassembly, and that $30,000.00 of the bid to be allocated to a contingency fund. Accordingly, the plaintiffs total bid of $395,000.00 was allocated as follows;
(1) dismantling, $ 63,000.00;
(2) repair of core, $ 40,000.00;
(3) masonry conservation, $158,000.00;
(4) metal conservation, $ 49,000.00;
(5) reassembly, $ 55,000.00;
and a contingency of $ 30,000.00.
8.The bid specifications originally called for the work to commence on the project by December 1, 1986, and with the work expected to be completed in 120 work days, by June 1, 1987. However, the plaintiff was not informed until December 3rd that his bid was accepted as the low bid; he was also then reminded of the bonding requirements. Notwithstanding a bid requirement that the successful low bidder be prepared to execute the contract within 5 days of notice of his selection, including completion of all contractual prerequisites, such as the performance bond, he did not present his bond to the city until May 11, 1987, delaying the execution of the contract until that day. This delay necessitated an extension of the completion date to August 31, 1987. While the number of available work dates to this completion date was comparably less than the originally contemplated 120 work days, interruption due to winter was no longer a consideration.
9. Both the bid specifications and the contract expressly noted that time was of the essence. The contract incorporated the invitation to bid and the project specifications as part of the contract and noted, given its funding sources,[1] that it was subject to various specified provisions of federal and state law, including environmental and wage laws.
10. The bid documents and a rider to the contract prohibited the plaintiff from assigning any of the monies payable under the contract unless written consent was previously given by both the Contracting Officer and the Worcester City Treasurer. (Ex. 3, p. 2 at ¶13; ex. 6, at ¶111^).) In order to secure his performance bond for the project, the plaintiff paid $40,000.00 from his own funds and provided a bank line of credit in the amount of $150,000.00, secured by an assignment to the creditor bank of his accounts receivable from this project as well as from his prior work on restoration of a portion of the Statue of Liberty.[2] The plaintiff provided no evidence that he ever sought or obtained the requisite consent to use his accounts receivable from the project to procure this line of credit. Thus, from the time when the plaintiff executed the contract with the city on May 11, 1987, he was already in violation of its terms.
11. The contract also required the plaintiff to submit a written work schedule within 14 calendar days after execution of the contract. (Ex. 4, at Division 1-3, 111.) Soon after the execution of the contract, the plaintiff had the first of many meetings with the contract architects Suzanne Carlson and John Herron, including weekly job progress meetings. The plaintiff never submitted the required written work schedule within 14 calendar days after execution of the Contract, nor at any other time during his tenure on this project. In addition to the requirement of a written schedule of work, they discussed several of the contract requirements and prohibitions, including that which barred work on weekends, nights or holidays except in emergency circumstances and the specification for work progress reports, shop drawings and material data sheets and samples. (Ex. 4, at Division 1-2, ¶6.) They explained that such documentation was required to enable the architects to ensure that materials and methods being utilized were compliant with the contract specifications and to make a record of actual work done on the monument and needing to be done, as well as a timetable for work to be done to enable the parties to ensure completion on time.
*398 12. On or about May 25, 1987, the plaintiff began work on the project. On June 3, 1987, plaintiff submitted his first application for payment, in which he sought payment in the amount of $56,145.00, for the period to June 3, 1987. (Ex. 8.) The form utilized for payment applications, at the direction of the project architect, was an “AIA” form (American Institute of Architects), that incorporated a provision of the contract that required the contractor to itemize his payment request among the phases of work that the particular application represents. The payment request was then to be submitted to the architect and “contracting officer” of the city, in this case, Thomas Taylor, the Commissioner of Parks and Recreation for their respective approval. In submitting payment application no. 1, the plaintiff certified that the work covered by that application had been completed in accordance with the contract documents. (Ex. 8.) That first application was signed by the contract architect on or about June 4, 1987 and was paid in full (after retainage), in the amount of $56,145.00 almost immediately thereafter.
13. Contrary to the contract documents, however, including his own bid that had included allocations among the 5 phases of the project, in his payment application no. 1, the plaintiff misapplied the overall contract amount of $365,000.00, as being allocated across only 4 phases, the plaintiff having deleted the “Repair Core” phase, and reallocated the scheduled value for the Repair Core phase of $40,000.00, across the other 4 phases. (Ex. 8, at p. 2.) This resulted in a distortion of the relationship of the degree of completion of work to the contract amounts per phase of work: the Plaintiffs reconfiguration of the scheduled values for the 4 phases in payment application no. 1 meant, for a person reviewing the appropriateness of the estimate of work completion within a phase, that an amount sought would represent a lower percentage of the full amount of the phase than would have been shown had there been no reallocation. For example, instead of showing the scheduled value of $49,000 for repair and metal conservation as bid and contracted, the Plaintiff showed a reconfigured value of $70,000; the plaintiffs reconfiguration had the effect of showing that the amount sought under this phase, namely, $23,000.00 was only 33% of the reallocated amount of $70,000.00, whereas the $23,000.00 sought would have been 47% of the original $49,000.00, amount for that phase, per the bid and contract. If Plaintiff had sought an amount that represented 47% completion of phase 1, Carlson would not have approved it as she did not believe that it fairly represented the actual status of this phase. Likewise, the amount allocated to masomy conservation per bid and contract was $158,000.00, whereas the value of this phase was represented by the plaintiff in this first payment application as being $ 178,000.00. These were significant misstatements of the status of the work.
14. The architects on the project met with Tsitsilianos on almost a weekly basis during the June through December period regarding the work and regarding the progress, and were often present on the site on a more frequent basis.
15. On or about June 29, 1987, Tsitsilianos submitted a second application for payment to the City and to the contract architect seeking payment in the amount of $24,833 for the period from June 3, 1987 to June 15, 1987. (Ex. 10, atp. 1.) By this application the plaintiff sought an additional $11,900.00 under the phase for repair and metal conservation, which would have represented an aggregate of 71% of the originally allocated $49,000.00, but was only 50% of the reallocated $70,000.00. The changed value for masomy conservation was also carried to this payment application. That second application was signed by the contract architect on or about June 29, 1987 and was paid in full (after retainage), in the amount of $24,833.00. As with the first application, had the plaintiff sought an amount that represented 71% completion for this phase on payment application no. 2, Carlson would not have approved it as she did not believe that such a description of the status at that time was accurate.
16. The specifications had been drafted and provided by the architect. These specifications were drawn upon an understanding, based upon original plans and drawings (but not upon “as built” plans, as such were not available), that there was no obstacle to complete separation and removal of the panels from the monument and their delivery to a remote location where cleaning and repair could take place within a controlled environment, a cleaning which, in part, would involve the dipping of the panels into a cleaning solution to assist in the removal of dirt, grime and the coatings that had been previously applied. The dismantling of the stone panels, their crating and removal first to an interim storage area was specified as a part of phase 1 of the work, and subsequent transfer to the plaintiffs “studio” was included in phase 3.
17. The monument core was first revealed, in late July or early August, when the fourth course of stone, the course immediately above the panels, was removed; it was only then discovered, and quite unexpectedly, that a slurry of concrete had been poured into a space that had been expected to exist between the outer face of the brick core and the interior face of the Trani stone panels, the slurry serving to adhere the panels to the brick core; I infer that this inner space, now absent, was intended as part of the overall inner drainage system of the monument. Also noted and possibly related to the presence of the slurry was the fact that the inside of the core was approximately half full of water, indicative of blocked drainage.
18. Upon closer inspection and evaluation, the degree of deterioration and fragmentation in the stone panels was believed to be related, at least in part, to *399 this unexpected element of a concrete slurry; the concrete was found, upon testing, to be highly compressive, in contrast to the Trani stone. These two materials also had differing rates of expansion and contraction. The cumulative effect over many years of the elements of the New England weather in both summer and winter, and the action of the freeze/thaw cycle upon the different masonry elements and their characteristics meant that the application of sufficient force necessary to separate the more fragile and less dense limestone from the concrete would expose them to additional and significant damage. It was therefore agreed amongst the parties that the panels could not be dismantled and removed off-site; this resulted in a significant impact upon the plaintiff, who would need to utilize a different and likely more labor-intensive and time-consuming method than originally planned to clean the stone panels on site. This included delicate chipping, by hand, with hammer and chisel, of the unwanted layers of dirt and other material, an alternative method which was approved, in theory, by the architects. This discovery also meant that the actual amount of dismantling that had been anticipated in the specifications and bid allocations would be significantly reduced.
18. However, it was only by letter dated September 14, 1987, from Ann Liebenstein, Worcester’s staff landscape architect, in which she notified the plaintiff that the contract had expired on August 31, 1987, was it first memorialized that an extension of the contract completion date would be necessary and, as proposed, to December 15, 1987. (Ex. 29.) While the plaintiff did not disagree with the need for a contract extension or a change order, he had also not been pro-active on this need for the additional time such as in accordance with his contractual responsibiliiy nor apparently being concerned with the need for any contractual formalities. A change order was signed by plaintiff on September 15, 1987, and the contract’s completion date was extended to December 16, 1987. (Ex. 9.) likewise, the plaintiff never sought a change order for any adjustments in the contract amounts to compensate him for the additional time to be expended in the cleaning or to reallocate amounts among the work phases, since little or no further effort was going to be required in the dismantling and removing of the panels, and a substantially different method of cleaning and repair of them would be needed, likely increasing the necessary time to do so.[3]
19. After the bronze statue and the upper three courses of stone on the Rogers-Kennedy Memorial had been removed, the plaintiff did some cleaning on the bronze, and some cleaning, by both chemical and mechanical methods, on the stone panels. However, between May 25, 1987 and mid-September 1987, especially as summer turned into fall, concern began to grow over the apparent decrease in the plaintiffs time and efforts on the project, which had begun promisingly with a flourish of activity. This concern was based upon observations by Suzanne Carlson, of the project architect team, who was at the project site at least 3 times per week, and some combination of Carlson and her partner John Herron was on site at least 4 times per week if not every day. Carlson was an experienced architect, including numerous preproject assignments of a similar nature involving restoration. She was especially concerned about the lack of supervision apparent upon her site visits, with particular concern about the dry chipping method of cleaning being utilized, since the process required minute and delicate strokes and constant reappraisal to minimize the potential for further damage. Tool marks from the chipping activity was observed by her and deemed unnecessary.
20. By letter dated September 18, 1987, John Herron informed the plaintiff that, due to his continued failure to honor their request for a work completion schedule, Suzanne Carlson had prepared such a schedule. Herron informed him that this schedule was tight but feasible, as long as the plaintiff did not close down the project on damp days or dismiss the workers early (Ex. 44.), facts which Carlson corroborated, and to which the plaintiff did not object.
21. By another letter dated October 7, 1987, with a copy sent to the plaintiff, Herron wrote to Thomas Taylor complaining that the plaintiff had, among other things:
1. failed to provide any documentation or photographs of the work;
2. failed to hire a superintendent since ‘Ted” left on August 28, 1987, failed to submit a resume for Worcester’s approval of proposed superintendents, and failed to be on the job long or often enough to superintend the work himself;
3. worked on the panels during one weekend in mid-July 1987; and
4. left nicks in the limestone panels from the use of hammer and chisel in the chipping/cleaning process.
The failure to provide documentation and photographs, and conducting work on weekends were contrary to express terms of the contract (Ex. 4, at p. 1-7, ¶20), as was the failure to provide a suitable superintendent and information thereon. (Ex. 4, at p. 1.1, ¶2.)
22. The plaintiffs third application for payment, covering the period of June 15, 1987 through September 15, 1987 was originally submitted on or about October 20, 1987 (Ex. 11, the “third application/first request”[4]). For the first time, the plaintiff submitted a payment application that was consistent with his bid that had identified the 5 phases of the project; he re-inserted the previously-deleted Repair Core phase, maintaining the overall contract amount at $365,000.00, returning the $40,000 amount originally scheduled for core repair that he had earlier allocated amongst the other 4 phases back into the Repair Core phase. (Ex. 11, at p. 2.) When payment applications were submitted to the architects for ap *400 proval, they acted on the city’s behalf, in accordance with the contract, which authorized the city to withhold progress payments when defective work was not remedied, and/or for unsatisfactory prosecution of the work by Plaintiff. (Ex. 4, at p. 1-6, ¶17.) She did not approve this payment application because the percentages of work purportedly completed were far in excess of what she observed to have been the actual status of progress for the pertinent period of time.
23.During the remaining months of this contract extension, the city and its representatives brought a number of other complaints to the plaintiff s attention, which included, among other things:
(A) that, as of August 3, 1987, he had not yet complied with various payroll reporting requirements (Ex. 28.);
(B) that when the Plaintiff finally submitted certified paperwork for the period from the week ending May 29, 1987 through the week ending October 22, 1987, a total of 22 weeks, to comply with payroll reporting requirements established by the U.S. Department of Housing and Urban Development (Ex. 7, at p. 1), and certified by him that the payrolls submitted for each week were correct and complete (Ex. 7, reverse side of each week’s submittal, at ¶2), when compared with the handwritten payroll records he and/or International Restoration Specialists kept in the ordinary course of business, numerous discrepancies become apparent. Among such discrepancies are (1) ‘Ted,” who was not listed on HUD paperwork for the week ending June 5, 1987, but the handwritten payroll records (Ex. 40, at p. 1) showed that he worked 32 hours; (2) “Walter Thompson” was listed on HUD paperwork as having worked 12 hours for the week ending June 12, 1987, yet the handwritten payroll records (Ex. 40, at p. 1) showed that “Walter” did not work that week; (3) “Edgar” was not listed on HUD paperwork for the week ending August 7, 1987, yet the handwritten payroll records (Ex. 40, at p. 3) showed that he worked 24 hours; and (4) for the week ending October 9, 1987, Plaintiff reported on the HUD form that there were a total of 191 man-hours worked, yet the handwritten payroll records showed a total of 24 man-hours worked (Ex. 40, at pp. 5 and 6);
(C) that the liability and workers’ compensation insurance policies naming Worcester as an additional insured on the Project, another contractual requirement, had expired in September 1987 (Ex. 29);
(D) in early November 1987, the plaintiff was sent a copy of a letter from the architects to Taylor, that he had done little in response to the recent weekly job performance meetings, including failing to make arrangements for a subcontractor to do concrete work, failing to do bronze repatriation tests, and failing to provide a resume for prospective superintendents). In addition, it was noted that the dry chipping had caused damage to the stone panels, as hammer tool marks were veiy apparent (Ex. 45 and 46). It was noted again that the plaintiff did not provide work progress reports, shop drawings nor reports on his materials and methods, as had been requested.
24. On November 19, 1987, the plaintiff submitted a second application for payment under no. 3, this invoice requesting the amount of $57,000.00, for the pay period from June 15, 1987 to September 15, 1987. (Ex. 12, at p. 1.) The entire amount sought was for masonry restoration work. (Ex. 12, at p. 2.) Similar to her response to his first application under request no. 3, Carlson did not approve this application because she did not believe that the amount of work claimed to have been done was done. Ann Liebenstein, another person to whom the payment application was submitted for approval concurred, observing that progress had been very slow, as no one had been seen working at the site whenever she had stopped by during the several weeks prior to her November 27, 1987 letter. (Ex. 36.) Neither this request, nor the first request under application no. 3 was approved by the ciiy for payment and the plaintiff has not received any payments other than as requested in his first and second payment applications.
25. The plaintiff was informed by Carlson by letter and orally at the November 4, 1987 job meeting, he was required to accomplish certain tasks by December 8, 1987, in order to give her a week to evaluate the status of the project as it relates to the project completion schedule and the temporary shelter for the monument before the contract’s expiration date on December 15, 1987. (Ex. 31.) These requirements were reiterated to the plaintiff in Taylor’s December 3, 1987 letter. (Ex. 32.) Certainly by this point in time but likely sooner, the plaintiff had come to recognize an increasing likelihood that he could not complete the project on time due to the decreasing temperatures, as some of protective coatings that he intended to apply to the stone required a minimum of 24 hours of continuous temperatures above 50 degrees for curing.
26. The monument had gone through the winter of 1986-87, without protection, waiting for the plaintiff as low bidder to get his performance bond. It was about to go through another winter, but now in a disassembled state, open to the elements, presently with inadequate protection. (Ex. 48.) The requirement that the plaintiff erect a temporary shelter was contained in the contract specifications, which required that, “[flollowing the removal of the stone facing, the core is to be ‘boxed’ (see Division 6-Carpentry) in a weather-tight covering, and safely secured for the [wjinter.” (Ex. 4, atp. 2a-2, IB.2.) Even when it became obvious, in the summer of 1987, that the panels could not be safely removed, a temporary shelter around the base of the monument to protect it against the impending winter elements continued to be necessary due to the delays caused first, by the plaintiff failing to secure his performance bond in a more timely fashion and thereafter by the changed nature of the cleaning process nec *401 essary and by the plaintiffs failure to prosecute the work expeditiously. Obviously, after the recognition that the stone panels would not be removed, the size of the shelter would be necessarily larger. Also, in contrast to the original purpose of the shelter as specified, given that the stone panels themselves would now be required to be inside the shelter for the winter and not brought to the plaintiffs studio, the city needed an adequate means of access inside the shelter to be able to inspect the panels to ensure that they were being adequately protected by the shelter.
27. The plaintiff worked over the weekend immediately prior to December 7, 1987, again contrary to contract terms, as he had not sought permission to do so. (Ex. 37.) This last-minute work was on the temporary shelter, which Carlson and Taylor had directed the plaintiff to erect by December 8, 1987. As for the temporary shelter that the plaintiff did erect, it failed to conform to the shop drawing the plaintiff had submitted in many respects: it had no door, the walls were neither plumb nor square, studs were not 16 inches on center but closer to 24 inches, the plywood was 3/8", not 1/2", and was not installed to the full height of the walls, the top of each of the walls was covered with canvas and polyethylene; lastly, the plaintiff had not allowed a 2-foot corridor between the monument and the walls of the shelter to allow for wintertime inspections, as required. Only after the temporary shelter was built did the plaintiff apply for a building permit.
28. The plaintiff failed to complete the project by the completion date of December 15, 1987; this was a violation of the contract term as amended. On or about December 15, 1987, Tsitsilianos sought assurance from the City that he would be able to resume performance of the contract in the spring of 1988. No one expressed to him at time that he would not be allowed to continue on the project. He claims to have completed 75% of the project work by December 15, 1987. Even if this were true, it does not amount to substantial completion. I find, however, that he had completed significantly less in terms of actual work on the project, especially considering the amount of work that he reported as still remaining to be done in his report to the city under cover letter of June 7, 1989, including stone and bronze conservation, core and drainage repair and reassembly (see ex. 22, §§A, C, D, M, O, P, R and T of plaintiffs report). Moreover, he had consistently failed to comply with virtually any of the time requirements for providing documentation, especially work schedules, personnel qualifications, shop drawings and materials and methods used; the documents that he ultimately did provide, in partial compliance with the contract and specifications, came only after repetitive prodding from the architects. Indeed, I infer that the materials he provided under his cover letter of June 7, 1989, were documents that were required under the original contract and never provided. His explanation that he provided all the documents that the architects asked of him is not believed. Even if true, this does not constitute a waiver of any documents required by contract specifications; I infer that it is more likely that he provided only such documents as would relieve the increasing pressure the architects were applying and that the architects did nothing to create any reasonable impression that any contract requirements, including documentation that he did not provide, was being forgiven or waived.
29. Representatives of the city wanted to inspect the monument in late January 1988. When they attempted to discuss this with the plaintiff, he could not be reached. (Ex. 38.) Being unsure of how well the panels were tolerating the winter and, due to their uncertainty of the actual protectiveness of the shelter, considering that exposure of the panels to the expansion and contraction of water when it freezes and thaws constituted the greatest risk of harm to them, the inspection team decided to go forward with an inspection, with or without the involvement of the plaintiff, knowing that some of the materials of the shelter (mostly tarp and plastic) would need to be removed and possibly damaged, since the plaintiff had built the shelter without reasonable means of access inside. (Ex. 39.) The plaintiff later responded that he would charge $1,000.00, for materials and another $1,000.00, for labor in re-constructing the shelter.
30. Upon entering the grounds in the spring of 1988 to continue the project, Tsitsilianos was almost immediately confronted, removed from the project site, and prohibited from doing further work thereon. By letter dated March 25, 1988, city representatives proposed to the plaintiff that, in light of the concrete slurry and attendant deterioration of the stone panels, the contract be amended so as to reduce the scope of his services and, consequently, the original amount of the contract, and asked him to respond by April 1, 1988. (Ex. 33.) After no response was received, the city sent a termination letter on May 27, 1988, to Tsitsilianos with regard to the project and he was not allowed on the project site thereafter.
31. Contemporaneously, the plaintiff had submitted a bid on the state capitol building in West Virginia and was subsequently awarded that bid, and thus likely made himself unavailable to complete the remaining work on the Rogers-Kennedy Memorial within a reasonable period of time.
32. From early in the contract term, the city had substantial concerns, which were frequently communicated to the plaintiff, about his ability to carry out all of the requirements of this project, not the least being the actual restoration work on the monument. In addition, given the reporting requirements of the funding sources for the project, as well as the need to carefully document the restoration work actually performed including methods and materials used, the city’s concerns and reluctance to allow the plaintiff to continue on the project were reasonable and substantial. Nevertheless, after extensive lobbying by the plaintiff, in November 1988, the ciiy offered to allow the Plaintiff to resume work *402 on the project, but in light of its reservations about the plaintiffs capacity to comply with all of the technical requirements of this project, it conditioned its approval of his return upon his employment of recommended restoration subcontractors whose experience was known to and approved by Worcester, such as Nicolas Veloz and Dennis Rude. (Ex. 35.) The plaintiff, through his attorney, informed the city that he would accept this offer, conditioned in turn upon the city’s rescission of its May 27, 1988 termination of the contract since, according to the plaintiff, that termination was proving to be a hindrance to his ability to secure firm commitments from Veloz and Rude, with whom he had spoken. (Ex. 34.) Accordingly, on February 22, 1989, the city issued a letter rescinding its May 27, 1988 termination, but only upon Plaintiffs fulfillment of 3 conditions:
1) Plaintiffs execution of an amendment to the Contract, in a form consistent with that proposed in March 1988, which contained certain deadlines;[5]
2) Plaintiffs strict compliance with the time frames established in the amended Contract; and,
3) Plaintiffs hiring of the professional subcontractors chosen by Worcester (any substitutes for Veloz or Rude would need to be approved by Worcester).
33. Plaintiff complied with the first condition by executing, on March 9, 1989, the amendment to the Contract. (Ex. 15.) The amendment expressly describes its effect, in Section III thereof, as follows:
The provisions set fourth [sic] in this amendment to the contract between the parties dated May 11, 1987 are hereby incorporated into that contract. In the event of any inconsistency between the terms of the contract as amended and the original contract, the provisions of the contract as amended shall apply.
Except insofar as they are changed by the terms and provisions of this amendment, all other terms and conditions of the contract dated May 11, 1987 shall remain unchanged.
34. Regarding the second of the three conditions, the plaintiff failed to strictly comply with the deadline of June 7,1989 established in the amended contract (time frame of 90 days from March 9, 1989) because, he failed to timely or satisfactorily submit or complete several items as required, including but not limited to: (A) a written description of the existing drainage system (ex. 15, p. 5, 1G); (B) 4 copies of shop drawings for anchoring and installing the fourth course on the Memorial (p. 5, fitH); (C) consolidation of the test area of the stone panels.
35. The plaintiff did not hire the professional subcontractors, Veloz and Rude, who had been recommended by the city, because they were too expensive. He stated that he had tried to substitute Constantine Seferlis and a man from the Higgins Armoiy for Veloz and Rude, asserting that he attempted to comply with this requirement in written correspondence with the city, claiming first that he had sent it to the Parks Department, then saying that it was sent to the architects, Herron and Carlson, and expressed his belief that he had kept documentation to support this claim. After this suggestion was made during his testimony, he was given an opportunity overnight to search for and provide written evidence of this communication the next day, he failed to do so. In any event, Worcester had previously rejected Seferlis and others as being unqualified. (Ex. 35, at p. 1.) Thus, the plaintiff failed to comply with the third condition of the agreement.
36. The failures on the part of the plaintiff to strictly comply with the detailed conditions of the amended contract, especially that calling for his retention of other contractors who had been requested by the city, were substantial. I find it significant that the contract amendment did not even call for the plaintiff to complete the project within 90 days, but only required him to provide documentation, including plans and reports and material data and samples, do some limited testing and to retain expert assistance within the 90-day period, which steps were viewed by the city as prerequisites to a reinstatement of the plaintiff to the project. The termination of the plaintiff, therefore, was not rescinded, nor were the previous contract violations waived by the city.
37. The plaintiff did not work on the project thereafter, and while he continued to lobby for permission to do so, he was never permitted to resume the restoration of the monument. The City did not communicate with Tsitsilianos from mid-1989, through August 1994, to suggest anything that Tsitsilianos could do in order to be allowed to physically go back on the project to complete it. It should have been obvious to the plaintiff from June 1989, that he was not going to be allowed on the project again and that he was not going to be paid on his outstanding invoices.[6]
38. While the city believed that the failure of the plaintiff to comply with the conditions of the amended contract amounts to a failure of the plaintiff to provide the city the basis on which it had agreed to rescind the original termination of contract sent in May 1988, another termination letter was sent to the plaintiff on August 12, 1994 (Ex. 24). In the interim, the city had contracted with another entity to build a more suitable shelter for the monument.

Discussion

The plaintiff seeks to recover damages that he alleges are due him on account of a breach by the defendant City of Worcester of a written contract between the parties, and specifically, for the defendant’s failure to pay for his services rendered pursuant to an agreement to restore a city monument. The damages that the plaintiff seeks are represented in two invoices that he sent to the city, in the amounts of $132,737.80, and $57,000.00, submitted as independent payment requests under his third application for payment. The city denies that he is entitled to recover damages, in any amount, due to his own substantial breach of contract in failing to complete *403 the project on time and a continual failure to comply with documentation requirements. The plaintiff replies that he substantially performed the contract on a timely basis, but, even if he had not, the city waived any such lapses when it agreed to an amendment to the contract in March 1989. The city responds, in turn, that the contract amendment was not a novation, that it did not waive any breaches by the plaintiff but agreed, conditionally, to allow him to resume work on the project and that he failed to honor the conditions of the amended contract.
Under Massachusetts law, the plaintiff “cannot recover on the contract itself without showing complete and strict performance of all its terms.” Peabody N.E., Inc. v. Town of Marshfield, 426 Mass. 436, 441 (1998), and Hayceck Building & Realty Co, Inc. v. Turcotte, 361 Mass. 785, 789 (1972), both citing Andre v. Maguire, 305 Mass. 515, 516 (1940). In addition, the Supreme Judicial Court observed that “the importance of holding those who engage in public contracts to act in strict accord with their undertakings is well recognized.” Albre Marble & Tile Co., Inc., v. Goverman, 353 Mass. 546, 549 (1968), also referencing G.L.c. 30, §391.[7]
A contractor who contracts to perform certain services for the other parly impliedly promises “to perform those services in a reasonably diligent, skillful, workmanlike, and adequate manner.” Previews, Inc. v. Everets, 326 Mass. 333, 335 (1950) (citations omitted). The burden is on the plaintiff contractor “to prove at least substantial compliance of the contract on... [his] part.” Id. (citations omitted). Otherwise, the plaintiff contractor is in breach of his implied promise. See id.
Here, there is no dispute over the existence of a valid contract. The issues that are in contest are: first, whether the plaintiff, at the time of the termination of his services, had been in substantial performance of his part of the agreement; second, if not, the effect that the contract amendment had on such lack of performance must then be determined; lastly, his performance under the contract as amended must be examined.
First, and notwithstanding that the contract and specifications did not anticipate that the stone panels were adhered to the core, could not be removed and would require substantially more labor to be expended in the cleaning of the panels by hand, the plaintiff had, by the extended date of December 15, 1987, failed to “completely and strictly perform” to the contract, in many respects, most notably that the work was not substantially completed, the plaintiff had continuously failed to meet deadlines and to provide significant documentation required by the specifications, if at all, and had failed to comply with the contract specifications. The plaintiff showed a continual pattern of being late in execution of required actions under the contract from its inception, the six-month delay in providing his performance bond being only the first. He continuously ignored requests for documents that were necessaiy for the city to comply with grant requirements and for other documentation that was necessaiy for the architect to ensure proper methods and materials were being used. The plaintiff contends, in effect, that the ciiy condoned or waived these contract failings and appears to seek advantage in the patience and cautious optimism with which the ciiy and its representatives dealt with him. It appears rather that he was either (1) overwhelmed by the dual responsibilities of this contract to do the necessary restoration work itself and the concurrent need to document the steps that were necessaiy to be accomplished, the methods and materials that were needed to accomplish those steps and then, to document what was actually accomplished, and how it was done, or (2) that he simply chose to conduct this project as he deemed appropriate, ignoring those contractual responsibilities that he deemed unnecessary and the right of the city and its representatives to supervise the project and take the steps necessaiy to ensure compliance with the specifications and funding source requirements. In any event, the plaintiff failed to sustain his burden to prove that he strictly and completely performed under the contract. The plaintiff also claims that the ciiy unlawfully or unfairly prevented him from completion of the project, for which failure of his performance thereafter may be excused. See Rigs v. Sokol 318 Mass. 337, 345 (1945). If the ciiy wrongfully prevented his continued performance, he would be entitled to recover the fair value of the work and materials furnished pursuant to the contract. Johnson v. Starr, 321 Mass. 566, 569 (1947); Frank Fitzgerald, Inc. v. Pacella Brothers, Inc., 2 Mass.App.Ct. 240, 242 (1974). In order for such a principle to have application, the plaintiffs performance must have been in substantial compliance with the contract at the time of the defendant’s conduct alleged to constitute wrongful interference. C.C.&T. Construction Co., Inc. v. Coleman Bros. Corp., 3 Mass.App.Ct. 372, 375 (1975); PDM Mechanical Contractors, Inc. v. Suffolk Const Co., Inc., 35 Mass.App.Ct. 228 (1993). Here, those principles do not assist the plaintiff, since he was in substantial breach at the time of the contract completion date, the city’s removing him from the site during the early Spring of 1988 and the formal notice by the ciiy of its termination of the contract in May 1988. Consequently, based upon the facts found and the above reasons, the termination of the plaintiffs services under the contract was justified and reasonable.
The plaintiff appears to contend that the city waived any claims of breach by the plaintiff when it agreed to a contract amendment and allowed him back on the project in March 1989,suggestiveofanovation. ‘Without the agreement of the parties to an extinguishment of the prior contract and to a substitution of the new contract, there can be no novation. See Larson v. Jeffrey-Nichols Motor Co., 279 Mass. 362, 366 (1932).” Pagounis v. Pendleton, 52 Mass.App.Ct. 270 (2001). The amendment to the contract to which the parties had agreed in March 1989, contrary to the view of the plaintiff and by its very terms, was not a new contract which swept the slate *404 clean of prior contract violations but rather shows an intention on the part of the parties to provide a means for the plaintiff to have the termination rescinded and for him to become reinstated on the project. It came with conditions, however, agreed to by the plaintiff that clearly addressed the very concerns which had led to the city’s decision to terminate the contract. He did not meet the conditions. He failed to satisfy the city that he was indeed ready, willing and able to finish the project in a manner satisfactory to the city. The decision of the city not to rescind its termination of his services under the contract was likewise justified and reasonable.
Finally, as an alternative theory of recovery, the plaintiff seeks damages in quantum meruit or its equivalent. “Quantum meruit is a theory of recovery, not a cause of action. It is a claim independent of an assertion for damages under the contract, although both claims have as a common basis the contract itself. Recovery under this theory is derived from the principles of equity and fairness and is allowed where there is substantial performance but not full completion of the contract. See generally, 5 S. Williston, Contracts §805 (3d ed. 1961).” J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 793-94 (1986). It has been further explained that “recovery can be made on quantum meruit, if the contractor can prove both substantial performance of the contract and an endeavor on his part in good faith to perform fully, and the burden is upon him to prove both. In the absence of special exculpating circumstances an intentional departure from the precise requirements of the contract is not consistent with good faith in the endeavor fully to perform it, and unless such departure is so trifling as to fall within the rule de minimis, it bars all recovery.” Andre v. Maguire, 305 Mass. 515, 516 (1940); Acme Plastering Co. v. Boston Housing Authority, 21 Mass.App.Ct. 669, 672-73 (1986). “In determining whether [the plaintiff] substantially performed under the contract, the judge’s task was to examine the evidence in reference to the entire contract, what had been done, and what had been omitted.” Id., at 671; J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 796 (1986).
Here, for largely the same reasons that the plaintiffs performance has been found wanting when analyzed under the applicable principles of law that govern claims of breach of contract, he has failed to prove he had substantially performed and completed the project by the contract completion date. The plaintiffs contract violations can hardly be viewed as de minimus.
The plaintiff additionally contends that since he completed all of the dismantling that could be done under the circumstances, for which he received only $9,300.00 of the $63,000.00 allocated to that phase, he is therefore entitled to all of the remaining funds that were allocated ($53,700.00) under this phase of the contract. Such a claim, which appears to suggest that the 5 phases of work under the contract can or should be parsed and each analyzed under contract or quantum meruit principles, ignoring that substantial work remained to be done under several of the phases, is neither supported by the applicable principles nor any other authority offered by the plaintiff.
Thus, the plaintiff has failed to meet his burden to prove that the city breached the contract or that he is entitled to damages.

ORDER FOR JUDGMENT

For the foregoing reasons, it is ordered that judgment enter in favor of the defendant and which dismisses the plaintiffs complaint.

 Funding for the project was described as including a “block grant” from the U.S. Department of Housing and Urban Development, and grants from the Massachusetts Historical Commission Preservation Project and the Massachusetts Olmstead Historic Landscape Preservation Program.

 This total amount of $190,000 represented 52% of the contract amount of $365,000, a percentage which Plaintiff characterized as normal for his projects.

 No explanations were offered by either party as to why the contract allocations were not adjusted, or the need to do so even discussed, to reflect this necessary shift in the amount of time in the dismantling and masonry conservation phases.

 This was the first of three payment applications that were submitted by the plaintiff under the heading of “third application.”

 Indeed, the documentation required to be submitted under this amendment are taken verbatim from that earlier proposal: Section 1 (A-D) and Section 2 (A-U) of the amendment to the contact signed on March 9, 1989, are the same as Sections 1A (A-D), 2 (A-G) and 3 (A-N) of Part II, while the time deadlines set out in the amendment of 30 days for section 1 and 90 days for Section 2 are more liberal than had been earlier proposed.

 In a supplemental brief filed by the defendant ciiy, a contention is made that the plaintiffs complaint should be dismissed as it was filed beyond the applicable statute of limitations, which is, according to the city, 6 years from the date of the breach, and not 20 years, contending that the contract was not under seal. I find however that the recitals of the signatories indicated that it was signed under seal, and that the 20-year statute of limitations applies. Based upon finding of fact no. 37, if the six-year statute applies, then the plaintiffs complaint, filed in 2000, is untimely, as I find that the 1994 termination letter referenced in finding no. 38, is surplusage.

 This statute states in relevant part: “every contractor having a contract for the ... maintenance, repair ... of any public building or public works for the commonwealth or any political subdivision thereof, shall perform all the work required by such contract in conformity with the plans and specifications contained therein. No wilful and substantial deviation from said plans and specifications shall be made unless authorized in writing by the awarding authority or by the engineer or architect in charge of the work who is duly authorized by the awarding authority to approve such deviations. In order to avoid delays in the prosecution of the work required by such contract such deviation from the plans or specifications may be authorized by a written order of the awarding authority or such engineer or architect so authorized to approve such deviation. Within thirty days thereafter, such written order shall be confirmed by a certificate of the awarding authority...” It should be noted that it has since been limited in application to “principles which govern recovery on quantum meruit' which shall be discussed, infra Acme Plastering Co. v. Boston Housing Authority, 21 Mass.App.Ct. 669, 673 (fri. 5) (1986).